THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| Z'IONTAE WOMACK,<br><br>                    Plaintiff,<br>v.<br><br>UNIFIED GOVERNMENT OF<br>WYANDOTTE COUNTY/KANSAS CITY,<br>KANSAS<br><br><br><br>                    Defendant. | Case No. 2:19-cv-2446-KHV |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Z'Iontae Womack, a female African American police officer with the Kansas City, Kansas Police Department, has moved for partial summary judgment as to Defendant's liability for race discrimination. Although Officer Womack (formerly known as Officer Z'Iontae O'Neal) has been in the Police Department since 2007 and has been evaluated as a valuable and productive employee, she has also been the subject of numerous instances of discipline. The Department has administered discipline against Plaintiff in a racially disparate manner.

The discipline against Plaintiff has grown out of a Department-wide atmosphere of racism against African American officers. During the tenure of Police Chief Terry Zeigler, who retired in 2019, African Americans, including Plaintiff, were disciplined at a far higher rate a higher rate and more severely than white officers. While the percentage of African American officers on the force has generally been between 10 and 12 percent, African Americans have been subject to over 20 percent of the instances of discipline and over 25 percent of the days of suspension; that is; African American officers are disciplined at approximately double the frequency of white officers and at more than double the severity. This pattern has held true not

only over a period of years, but also for each year individually. African Americans have also been the subject of over 25 percent of the terminations and demotions, despite being far less represented on the force.

Plaintiff's individual circumstances bear this out; she has been disciplined for sleeping while on duty, an infraction for which white officers are disciplined less often. Plaintiff has also been disciplined for alleged driving infractions. In one instance, Plaintiff and her white male partner made a joint decision regarding violating a traffic restriction; the Department disciplined Plaintiff, but not her white partner, even though it had imposed discipline against an African American officer in similar circumstances. Reviewing her discipline of a one-day suspension, Chief Zeigler tripled the discipline to three days, adding a day for the alleged traffic infraction and imposing an additional day because Plaintiff raised the incident with the Unified Government's Human Resources Department, which, he said, took the matter outside the chain of command.

Defendant's own documents, testimony, and stipulations establish these facts regarding racially disparate discipline, both Department-wide and specifically with respect to Plaintiff. In these circumstances, Plaintiff is entitled to partial summary judgment with respect to Defendant's liability for race discrimination under Title VII and § 1981.

Plaintiff's motion is limited. Plaintiff is pursuing two claims in this case: (1) race discrimination; and (2) hostile work environment based on race, in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §§ 1981 and 1983. In this motion, Plaintiff seeks summary judgment only as to Defendant's liability for race discrimination, not for hostile work environment. If this case were to proceed to trial, Plaintiff would present more robust evidence regarding both claims. If the Court grants this motion, trial with respect to Plaintiff's race

discrimination claim would proceed only as to damages.

## STATEMENT OF UNCONTROVERTED MATERIAL FACTS

**Background and Performance**

1. Plaintiff Z'Iontae Womack has been employed as a patrol officer by the Kansas City, Kansas Police Department ("KCKPD") since July 2007. Pretrial Order, Doc. No. 38, Factual Stipulations, ¶ 1.

2. Womack is an African American female. Pretrial Order, Doc. No. 38, Factual Stipulations, ¶ 4.

3. The Unified Government, a municipality located in Wyandotte County, Kansas City, Kansas, employs more than 500 persons. Pretrial Order, Doc. No. 38, Factual Stipulations, ¶ 5.

4. Plaintiff's performance reviews praise her work performance, with comments such as:

- "Carefully considers all aspects of a situation before making a decision."
- "Gets along well and works well with everyone on the shift."
- "Is currently on the Sgt's promotion al list and has been acting Sgt. Several times."
- "Remains calm and composed during stressful situations."
- "Takes acting SGT and is able to manage the shift."
- "Accepts direction of superiors without challenging authority. Willing to help others when needed."

Exhibit 4, Performance Reviews.

**Racially Disparate Discipline Across the Department**

5. Based on the demographic information Defendant has provided, African American officers made up the following percentages of the police force by year:

- 2016: 11.58%
- 2017: 12.10%
- 2018: 10.54%
- 2019: 11.02%
- 2020: 11.30%

Exhibit 5, Police Department Demographic Information; Exhibit 7, Summary of Departmental Information on Racially Disparate Discipline.

6. The Department maintains information regarding discipline of police officers by race. Exhibit 6, Departmental Discipline by Race.

7. For the period from 2014 to 2019, the years that Terry Zeigler was Chief of Police, KCKPD provided information regarding 189 instances of discipline. Exhibit 6, Departmental Discipline by Race; Exhibit 7, Summary of Departmental Information on Racially Disparate Discipline.

8. Of those 189 instances of discipline, 39, or 20.63 percent, we issued to African American officers. Exhibit 6, Departmental Discipline by Race; Exhibit 7, Summary of Departmental Information on Racially Disparate Discipline.

9. During the same period, the Department issued 751 total days of suspension, 194 of which, or 25.83 percent, were issued to African American officers. Exhibit 6, Departmental Discipline by Race; Exhibit 7, Summary of Departmental Information on Racially Disparate Discipline.

10. During the same period, the Department terminated 15 officers, four of which (26.66 percent) were African American officers. Exhibit 6, Departmental Discipline by Race; Exhibit 7, Summary of Departmental Information on Racially Disparate Discipline.

11. The Department's patterns of disparate racial discipline holds not just for the entire period for which Defendant has provided information, but in individual years. Although the percentage of African American offices has fluctuated between 10.54 percent and 12.10 percent, the Department disciplined African American officers more frequently. African American officers were the targets of instances of discipline in the following percentages:

- 2014: 20%
- 2015: 17.86%
- 2016: 35.14%
- 2017: 17.02%
- 2018: 16.66%

Exhibit 6, Departmental Discipline by Race; Exhibit 7, Summary of Departmental Information on Racially Disparate Discipline.

12. The Department also disciplined African American officers more severely during that period, with the following percentages of the total days of suspension being issued to African American officers:

- 2014: 40.26%
- 2015: 26.59%
- 2016: 29.81%
- 2017: 19.05%
- 2018: 24.12%

5

Exhibit 6, Departmental Discipline by Race; Exhibit 7, Summary of Departmental Information on Racially Disparate Discipline.

13. While it is the policy of KCKPD to administer discipline in a consistent fashion, the Chief's office takes no particular action to ensure that discipline is issued in a racially consistent manner. Exhibit 2, 30(b)(6) Deposition Testimony by Pamela Waldeck, p. 57.

14. When asked whether "African-American officers [were] more likely to commit violations than white officers, Defendant's designated deponent responded, "not to my knowledge." *Id.*, p. 58.

15. Asked further about whether African American officers commit violations more often than white officers, Defendant's deponent testified that while the numbers might indicate that, she did not think that that was the case. *Id.*, p. 112.

16. The Department has not investigated whether its disciplinary practices might be the result of implicit racial bias. *Id.*, p. 114.

17. When asked about implicit bias and whether discipline might be meted out in a racially biased way, even if not consciously so, the Unified Government's Human Resources representative testified, "I think there could be some unconscious bias there." Exhibit 3, 30(b)(6) Deposition Testimony by Renee Ramirez, pp. 55-56.

18. Under normal circumstances, the Chief of Police is involved in disciplinary situations concerning officers. Exhibit 2, 30(b)(6) Deposition Testimony by Pamela Waldeck, p. 37.

19. The Chief of Police sets the tone for Discipline. Exhibit 2, 30(b)(6) Deposition Testimony by Pamela Waldeck, p. 48.

20. Under KCKPD disciplinary policy, the Chief of Police has responsibility for all instances of discipline, and has discretion in every case of discipline. Exhibit 8, General Order on Discipline, Section III; Exhibit 2, 30(b)(6) Deposition Testimony by Pamela Waldeck, p. 52.

21. KCKPD subjects officers to the same disciplinary standards regardless of rank. According to Defendant's designated deponent on discipline, captains, sergeants, and patrol officers "are managed in the same manner." Exhibit 2, 30(b)(6) Deposition Testimony by Pamela Waldeck, p. 95.

22. Regardless of whether officers are part of the bargaining unit of the Fraternal Order of Police, it "is fair to say" that the Department tries to administer discipline consistently. *Id.*, p. 96.

**Individual Discipline**

23. Plaintiff has been disciplined for sleeping duty on three occasions: September 22, 2016, November 27, 2016, and December 23, 2017. The Department imposed discipline against plaintiff involving days of discipline. Pretrial Order, Doc. No. 38, Factual Stipulations, ¶ 6; Exhibit 9.

24. In 2018, the Department reclassified sleeping on the job from a minor violation to a major violation. Pretrial Order, Doc. No. 38, Factual Stipulations, ¶ 7; Exhibit 2, 30(b)(6) Deposition Testimony by Pamela Waldeck, p. 120.

25. On January 5, 2017, Plaintiff reported her supervisor, Sergeant Keith Falkner, who is white, for sleeping on duty at his desk. Pretrial Order, Doc. No. 38, Factual Stipulations, ¶ 9.

26. As a result of Plaintiff's report, Sergeant Falkner received discipline of 25 points. Pretrial Order, Doc. No. 38, Factual Stipulations, ¶ 10.

27. Defendant has produced documents concerning discipline of other officers for sleeping on the job. Those documents are attached as Exhibit 9; Exhibit 2, 30(b)(6) Deposition Testimony by Pamela Waldeck, p. 121.

28. In total, KCKPD has identified 10 instances in which it has disciplined officers for sleeping on job. Pretrial Order, Doc. No. 38, Factual Stipulations, ¶ 6; Exhibit 9, Discipline for Sleeping on the Job.

29. Of the 10 instances identified in which officers have been disciplined for sleeping on the job, two involve white officers, and either seven or eight involve African American officers. Pretrial Order, Doc. No. 38, Factual Stipulations, ¶ 6; Exhibit 12, Declaration of Z'Iontae Womack, ¶ 2.

30. On February 4, 2017, Major Solomon Young, an African American commander in the KCKPD, was driving an unmarked command vehicle when he followed Plaintiff and her passenger, Officer Brian Minich, who were in a marked patrol car. Pretrial Order, Doc. No. 38, Factual Stipulations, ¶ 11.

31. Following Plaintiff's complaint against Major Young, KCKPD Internal Affairs investigated the February 4, 2017 incident and found policy violations that resulted in Major Young's resignation in lieu of termination, as well as the issuance of discipline or reprimands to several other officers, including Womack. Pretrial Order, Doc. No. 38, Factual Stipulations, ¶ 16.

32. During the February 4, 2017 incident, Plaintiff and her partner, Brian Minich, "decided together to disregard the signal and proceed if safe to do so." Exhibit 10, Narrative of Womack Traffic Incident; Exhibit 12, Declaration of Z'Iontae Womack, ¶ 6.

33. Plaintiff was disciplined for alleged traffic violations occurring during this incident. On April 24, 2017, Chief Zeigler issued Womack a two-day suspension for violating

8

General Order 40.03. He issued her a one-day suspension for reporting her complaint to Human Resources rather than the Bureau Director in violation of General Order 20.01. Pretrial Order, Doc. No. 38, Factual Stipulations, ¶ 17.

34. Plaintiff's partner, Brian Minich, who was in the passenger seat, and who is white, was not disciplined. Pretrial Order, Doc. No. 38, Factual Stipulations, ¶ 18.

35. In a similar incident, two African American officers were disciplined for traffic violations. The passenger was issued a memorandum criticizing him for his "decision to pursue out of this division for a traffic infraction." Exhibit 11, Discipline for Alleged Traffic Violations. The officer received a one-day suspension. *Id.* The driver in that incident likewise was disciplined. *Id.*

36. In that incident, both officers were African American. Exhibit 12, Declaration of Z'Iontae Womack, ¶ 5.

**ARGUMENT**

**I.      Summary Judgment Standard**

A motion for summary judgment in a Title VII case is evaluated under Federal Rule of Civil Procedure 56(c). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *U.S. ex rel. Behrani v. Conagra, Inc.*, 465 F.3d 1189, 1197 (10th Cir. 2006). Under Fed. R. Civ. P. 56(c), summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Although the court must construe the evidence in a light most favorable to the nonmoving party, *Medical Liab. Mut. Ins. Co. v. Alan Curtis L.L.C.*, 519 F.3d 466, 471 (8th Cir. 2008), the "mere existence of

some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). To stave off summary judgment, a factual dispute must by bona fide and "affect the outcome of the suit under the governing law." *Id*. at 248.

In resisting a motion for summary judgment, the nonmoving party may not rest merely on its pleadings. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). Instead, the nonmoving party must come forward with evidentiary materials of the type listed in Rule 56(c), such as deposition testimony or affidavits, demonstrating genuinely controverted issues of material fact. *Id*. at 324. The evidence proffered by the nonmoving party must be more than "merely colorable" or more than a "scintilla" to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 249, 251.

Where, as here, reasonable minds could not differ that Defendant disciplined officers in a racially discriminatory manner, summary judgment is appropriate. *See Anderson*, 477 U.S. at 250.

## II. Plaintiff is Entitled to Summary Judgment as to KCKPD's Liability for Race Discrimination.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000e-2(a)(2). Plaintiff here, an African American police officer, was treated less favorably than her similarly situated Caucasian coworkers.

Because Defendant does not admit to imposing racially disparate discipline, Plaintiff bases her showing on indirect evidence. Her Title VII race claim is therefore evaluated using the

familiar burden-shifting framework set forth in *McDonnell Douglas Corp., v. Green,* 411 U.S. 792 (1973). *See Frazier v. GPI KS-SH, inc. d/b/a Shawnee Mission Hyundai and Group 1 Automotive, Inc.,* Case No. 2:19-cv-02020-JWL (D. Kan., May 18, 2020). Under that framework, it first falls to Plaintiff to set forth a *prima facie* case of race discrimination. To meet that burden, Plaintiff must show: 1) membership in a protected class; 2) an adverse action; and 3) evidence that the adverse action took place under circumstances giving rise to an inference of discrimination. *See Id., citing EEOC v. PVNF, LLC*, 487 F.3d 790, 800(10th Cir. 2007).

Once Officer Womack has met her initial burden of showing these three elements, the burden then shifts to the Unified Government to assert a legitimate nondiscriminatory reason for the adverse action. If the Unified Government proffers alleged nondiscriminatory reasons for the adverse action, it then falls to Plaintiff to show that the purported reasons are mere pretext for illegal discrimination. *Id., citing Simmons v. Sykes Enters*., 647 F.3d 943, 947 (10th Cir. 2011).

We show below that Plaintiff meets those elements under Title VII and that the reasons the Unified Government offers for its racially disparate discipline are pretext for unlawful discrimination.

**A. Plaintiff's Race Discrimination Claim Satisfies the Title VII Elements.**

As an African American, Plaintiff meets the first element of her *prima facie* burden. Defendant does not dispute this element.

Because Plaintiff was disciplined and suspended on several occasions, she can easily establish the second element as well, that there was an adverse action. The Tenth Circuit "liberally construes" the term "adverse employment action," and instructs that the analysis of whether a particular event constitutes an adverse action should be undertaken on a "case-by-case approach, examining the unique factors relevant to the situation at hand." <u>Hillig v. Rumsfeld</u>, 381

11

F.3d 1028, 1035 (10th Cir. 2004)(citations omitted). Further, adverse employment actions do not necessarily require monetary loss. Rather, adverse actions can include acts that "carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects." *Al-Hammouri v. American Bottling Company,* 2019 WL 6174375 a*t* \*16 (D. Kan. 2019). There is no doubt, and Defendant does not appear to contest, these elements.

Plaintiff can also establish the third element of her *prima facie* claim, that discipline was imposed on her in circumstances giving rise to an inference of discrimination. As set forth in Plaintiff's Statement of Uncontroverted Material Facts ("PSOF") above, the Kansas City, Kansas Police Department disciplines its officers, across the board, in a racially discriminate manner. PSOF 5-12. Moreover, the discipline that has been imposed on her individually, for sleeping and for driving infractions, has been imposed in a racially disparate manner, in that the Department disciplines African American officers far more often for white officers for sleeping on the job, even though the Department does not believe African American officers commit infractions more frequently than white officers. PSOF 14-15. And with respect to alleged traffic infractions, the documents show that Chief Zeigler disciplines white and African American officers differently, and on review, he intensified the discipline imposed against Plaintiff. PSOF 33.

Thus, Plaintiff can establish a *prima facie* case that KCKPD disciplines African American officers, including Plaintiff, more frequently and more severely than it disciplines white officers. The burden therefore shifts to Defendant to establish a legitimate nondiscriminatory reason for the adverse actions it imposed on Plaintiff.

### B. Any Proposed Legitimate, Nondiscriminatory Reason for the Discipline Imposed on Plaintiff is Pretext for Race Discrimination.

Defendant has taken that position that the discipline it imposes is based solely on officers' conduct, and not on race; that is, Defendant asserts a legitimate, nondiscriminatory

12

reason for the discipline imposed on Plaintiff (and other African American officers). The focus therefore returns to Plaintiff for a showing that the proffered reason is pretext for illegal discrimination. A plaintiff may show pretext in many different ways, but in essence, a plaintiff shows pretext by presenting evidence of "weakness, implausibility, inconsistency, incoherency, or contradiction in the employer's stated reasons, such that a reasonable jury could find them unconvincing." *See Debord v. Mercy Health System of Kansas, Inc.*, 737 F.3d 642, 655 (10th Cir. 2013).

One way to show pretext is with evidence that the defendant has treated similarly situated employees differently. *See Fuller v. Meredith Corp.*, No. 17-2335-JWL, 2018 WL 3973147, at *3 (D. Kan. Aug. 20, 2018), citing *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1197 (10th Cir. 2011). A plaintiff can show that to employees are similarly situated by establishing that (1) they are governed by the same standards governing performance and discipline; (2) they are disciplined by the same person; and (3) they are alleged to have committed infractions of comparable seriousness. *See Swackhammer v. Sprint/United Management Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007); *Macon v. UPS*, 743 F.3d 708, 717 (10th Cir. 2014); *Lucero v. Sandia Corp.*, 496 F. App'x 903, 909 (10th Cir. 2012); *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).

Plaintiff can establish these elements based on the discipline the Department has meted out to Plaintiff individually and to officers in the Department in general. Plaintiff, as an African American officer, was directly subject to KCKPD's racially disparate discipline practices, particularly during the tenure of Chief Terry Zeigler.

### 1. Under Police Chief Terry Zeigler, KCKPD Disciplined Police Officers, Across the Board, in a Racially Discriminatory Manner.

Terry Zeigler was Chief of Police in Kansas City, Kansas during the period from 2014 to 2019. PSOF 7. During that period, the Department consistently disciplined African American officers more frequently and more severely than white officers. For example, of 189 instances of discipline for which the Department has provided information, 20.63 percent of those instances of discipline were imposed on African American officers, even though only approximately 10-12 percent of KCKPD officers were African American. PSOF 5-8.

The Department also disciplined African American officers more severely during that period. The Department has provided information regarding discipline totaling 751 days of suspension. Of those days of suspension, 25.83 percent were imposed on African American officers. PSOF 9. In addition, African American officers were the subject of 26.66 percent of the terminations during that period. PSOF 10.

The frequency and severity of Departmental discipline imposed on African American officers was not a fluke of some particularly severe instance of discipline; the same pattern held true year after year during the period when Zeigler was Chief. During that period, while African American officers made up 10 to 12 percent of the force, they were the subject of between 16.66 percent and 35.14 percent of the instances of discipline. PSOF 11. Likewise, they received between 19.05 percent and 40.26 percent of the days of suspension issued to officers during that period. PSOF 12.

These percentages, taken directly from the documents Defendant maintains on discipline of officers, show that the Department has a long-standing pattern of imposing discipline on officers in a racially disparate manner. Courts have long permitted this type of evidence in support of claims of discrimination. *Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 746 (10th Cir.

1991) ("It is uniformly recognized that statistical data showing an employer's pattern of conduct toward a protected class can create an inference that an employer discriminated against an individual member of the class"). Moreover, different types of discrimination, even if they are not identical to the discrimination alleged, can be probative. *E.g.*, *Fuentes v. Perskie*, 32 F.3d 191, 204 (3rd Cir. 1994) (part of a plaintiff's burden of proof can be met by showing discrimination against other protected classes of persons).

Thus, the Department's widespread and consistent treatment of African American officers, consistently disciplining them more frequently and severely than other officers, is probative of discrimination against individual officers. This is particularly true given that the Defendant's designated deponent testified that she did not believe African American officers committed infractions at rates greater than white officers. PSOF 14-15. Indeed, as Defendant's Human Resources representative testified, "I think there could be some unconscious bias there." PSOF 17.

### 2. The Individual Discipline Imposed on Plaintiff was Discriminatory.

But Plaintiff does not just rely on Department-wide statistics of racially disparate discipline. Plaintiff has been the subject of discipline for sleeping on the job and for traffic violations. Examination of those instances of discipline shows that they fit KCKPD's pattern of racially disparate discipline.

#### a. Sleeping on the Job

Plaintiff was disciplined for sleeping on the job in September 2016, November 2016, and December 2017. PSOF 23. The Department has provided information regarding 10 instances of officers being disciplined for sleeping on the job, either seven or eight – 70 or 80 percent – were imposed on African American officers. PSOF 28-29. Discipline for sleeping imposed against

African American officers is particularly problematic, not only because of the high percentage of these instances that are imposed against African American officers, but because this particular alleged infraction invokes long-standing racial stereotypes. But far from demonstrating consciousness of the appearance of this racially disparate discipline, the Department in 2018 re-categorized sleeping on the job from a minor violation to a major violation, intensifying the discipline the Department already imposed on African American officers. PSOF 24.

Aside from the heavy, 70-80 percent burden the Department imposed on African American officers for sleeping, the discipline imposed against African American officers compares unfavorably to that imposed on white officers. The Department has provided information on only two white officers who have been disciplined for sleeping on the job. One of them, received only points against his record, while Plaintiff received days of suspension. PSOF 23.

Defendant's police officers disciplined for sleeping are valid comparators. In addition to being disciplined for the same alleged infraction, they are all subject to the same standards of discipline. The Department's designated deponent on discipline testified that the same disciplinary standards apply regardless of rank, and that captains, sergeants, and patrol officers "are managed in the same manner." PSOF 21. She also testified that the Department imposed the same discipline regardless of whether the officer of part of the bargaining unit of the Fraternal Order of Police. PSOF 22.

In addition, all officers are subject to the same individual disciplinary authority: the Chief of Police. Under Departmental policy, the Chief of Police has responsibility and discretion in every case of discipline. PSOF 20. Not only does the Chief set the tone for discipline in the Department, but under normal circumstances, the Chief is involved in disciplinary situations

involving officers. PSOF 18-19.

Thus, the discipline imposed against Plaintiff for sleeping on the job has been administered in a racially disparate manner compared to how it has been administered to white officers, who are similarly situated in every material respect.

### b. Traffic Infractions

Plaintiff was also disciplined for alleged traffic violations arising from an incident in which she and her partner were chased by another vehicle, which turned out to be another police officer. During that incident, Plaintiff and her partner, Brian Minich, a white male "decided together to disregard a [red light] and proceed if safe to do so." PSOF 32. Plaintiff was disciplined for that decision, and the Department's discipline against her illustrates the Department's practice of imposing discipline in a racially disparate manner in at least two ways. First, even though Plaintiff and her white partner made the decision to run a red light, the Department disciplined only Plaintiff, not her white partner. PSOF 33-34. While the Department may argue that the reason it disciplined Plaintiff and not her white partner was that Plaintiff was driving and the partner was a passenger, Defendant's own documents show that that is not the Department's practice. In a similar incident, two officers, both African American, one driver and one passenger, were disciplined for alleged traffic violations. PSOF 35.

That is, the Department looked at the conduct of Plaintiff and her white partner, who together decided to take a particular course of action, and decided to discipline the African American officer – Plaintiff – but not the white officer.

Second, after Plaintiff sought to limit the discipline imposed from this event, Chief Zeigler responded by tripling her discipline. Although a single day of suspension had initially been imposed, Chief Zeigler revised that suspension to a two-day suspension, and he imposed an

17

additional day for reporting her complaint to the Unified Government's Human Resources Department. PSOF 33. While the Department may argue that the Human Resources Department was "outside the chain of command," the practical effect of this discipline is as bad as it appears: not only did Chief Zeigler take an already racially discriminatory disciplinary situation and intensify it, he disciplined an employee for reporting the Chief's disciplinary misconduct to Human Resources. If an employer wants to try to escape consequences for discriminatory employment practices, one way is to disincentivize employees from reporting misconduct to Human Resources. That is exactly what Chief Zeigler did.

In short, the Department has imposed individual discipline on Officer Womack in a racially discriminatory manner. The Department's own documents show that those actions fits the Department's larger pattern of racially disparate discipline. In spite of Defendant's expected protestations to the contrary, a reasonable jury will have no basis to conclude that the Department's disciplinary decisions are racially neutral. Plaintiff therefore should be granted summary judgment as to Defendant's liability for race discrimination.

### III. Plaintiff is Entitled to Summary Judgment as to the Unified Government's Liability Under Section 1981.

Plaintiff's claims for race discrimination, cognizable under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 (through Section 1983) are intertwined and based on the same elements. *See Rawlins-Roa v. United Way of Wyandotte County, Inc.*, 877 F.Supp. 1101, 1106-07 (D. Kan. 1997). The *McDonnell-Douglas* burden shifting analysis that applies under Title VII also applies to Section 1981 claims based on race. *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 455 (2006). Thus, for the same reasons Plaintiff is entitled to summary judgment on his Title VII claims for race and national origin discrimination, he is entitled to summary judgment on his Section 1981 claim for race discrimination.

**Conclusion**

Plaintiff, has for years admirably served the Kansas City, Kansas Police Department. For years, however, the Department has disciplined Plaintiff, as well as other African American officers, in a racially disparate manner. The Department's own records establish that it disciplines African American officers twice as often and twice as severely as white officers, and the discipline it has imposed on Plaintiff fits that pattern and further illustrates the race discrimination the Department engages in. The Department insists that it imposes discipline in a racially neutral manner, but its own records belie that assertion of innocence. No plausible explanation exists for the Department's imposition of racially disparate discipline other than race discrimination in violation of Title VII and Section 1981. Under these circumstances, Plaintiff is entitled to summary judgment as to KCKPD's liability for illegal discrimination.

Respectfully submitted,

**DUGAN SCHLOZMAN LLC**

 /s/ *Mark V. Dugan*
Heather J. Schlozman, KS Bar # 23869
Mark V. Dugan, KS Bar # 23897
heather@duganschlozman.com
mark@duganschlozman.com
8826 Santa Fe Drive, Suite 307
Overland Park, Kansas 66212
Telephone:  (913) 322-3528
Facsimile:   (913) 904-0213

**Counsel for Plaintiff**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing was filed electronically this 10th day of March 2021, providing notice on all counsel of record.

/s/ *Mark V. Dugan*